**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAUN WARRICK, | : | Civil No. 3:23-cv-591 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| SECRETARY LAUREL HARRY, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

Plaintiff Shaun Warrick ("Warrick"), an inmate housed, at all relevant times, at the State Correctional Institution, Camp Hill, Pennsylvania ("SCI-Camp Hill"), commenced this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1). The remaining claims are a Fourteenth Amendment procedural due process claim and an Eighth Amendment conditions of confinement claim against Defendant Laurel Harry.

Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 106). The motion is ripe for resolution. For the reasons set forth below, the Court will grant the motion.

I.    **Statement of Undisputed Facts**[1]

Warrick was housed at SCI-Camp Hill from December 6, 2020 to April 20, 2021. (Doc. 107 ¶ 7; Doc. 116 ¶ 2). On April 19, 2021, Warrick assaulted Correctional Officer Donna Green. (Doc. 107 ¶ 8; Doc. 116 ¶ 2).

Defendant Harry was the Superintendent of SCI-Camp Hill in 2021 until she became Secretary of the Department of Corrections ("DOC") in 2023. (Doc. 107 ¶ 9; Doc. 116 ¶ 2).

Facts Pertaining to Warrick's Fourteenth Amendment Due Process Claim

Warrick generally alleges that Defendant Harry initiated his placement on the Restricted Release List ("RRL") and "continued it without affording him the opportunity for meaningful review or appeal." (Doc. 107 ¶ 10; Doc. 116 ¶ 3). Defendant Harry maintains that she was not involved with Warrick's placement on the RRL. (Doc. 107 ¶ 11). In response, Warrick contends that Defendant Harry's signature is on the "Prohibited Violent Act Post-Response Review" form, indicating that she approved the request that Warrick should be considered for placement on the RRL. (Doc. 116 ¶ 3).

DC-ADM 802 is the Department of Corrections' policy concerning Administrative Custody ("AC"). (Doc. 107 ¶ 12; Doc. 116 ¶ 4). During the relevant time period, July 19,

---

[1]    Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (Docs. 107, 116).

2

2021 to October 28, 2024, at least three versions of DC-ADM 802 were in effect. (Doc. 107 ¶ 12(a); Doc. 116 ¶ 4). DC-ADM 802 requires that the Program Review Committee ("PRC") review the status of each inmate on AC status every seven days for the first two months. (Doc. 107 ¶ 13; Doc. 116 ¶ 4). DC-ADM 802 requires that, after the first 60 days, the PRC shall review every inmate on AC status every 90 days. (Doc. 107 ¶ 14; Doc. 116 ¶ 4).

Defendant maintains that Warrick cannot produce competent admissible evidence to establish the fact that he was not afforded program reviews. (Doc. 107 ¶ 15). In response, Warrick contends that at "95%" of his reviews, he "was either not allowed to speak, or his concerns were totally disregarded." (Doc. 116 ¶ 4). Warrick met with the PRC on the following dates: July 29, 2021; August 5, 2021; August 12, 2021; August 19, 2021; August 26, 2021; September 2, 2021; September 9, 2021; September 16, 2021; September 24, 2021; October 21, 2021; November 18, 2021; December 16, 2021; December 29, 2021; January 5, 2022; January 12, 2022; January 19, 2022; January 26, 2022; February 2, 2022; February 9, 2022; March 24, 2022; May 25, 2022; June 15, 2022; July 6, 2022; September 7, 2022; September 21, 2022; November 30, 2022; February 22, 2023; May 17, 2023; June 28, 2023; August 16, 2023; November 15, 2023; February 14, 2024; and November 14, 2024. (Doc. 107 ¶ 15(a)).

The parties agree that Defendant Harry was not involved in Warrick's AC status reviews. (Doc. 107 ¶ 16; Doc. 116 ¶ 5).

3

DC-ADM 802 requires that an inmate's RRL status be reviewed annually. (Doc. 107 ¶ 17; Doc. 116 ¶ 5).

Defendant Harry maintains that she did not review Warrick's continued placement on the RRL. (Doc. 107 ¶ 18). In response, Warrick asserts that although Defendant's exhibits reflect that Harry did not review his continued placed on the RRL, he argues that those exhibits only pertain to when Defendant Harry was the Superintendent of SCI-Camp Hill. (Doc. 116 ¶ 5). Warrick contends that when Defendant Harry became the Secretary of the DOC, "it was part of her duty to review RRL status…" (*Id.*).

Warrick was approved for RRL removal on October 28, 2024. (Doc. 107 ¶ 19; Doc. 116 ¶ 5).

### Facts Pertaining to Warrick's Eighth Amendment Conditions of Confinement Claim

According to Defendant, Warrick generally alleges that Harry was "deliberately indifferent to the potential for serious harm caused by subjecting him to prolonged solitary confinement" and that Defendant Harry "disregarded his health and safety by placing him on indefinite RRL status." (Doc. 107 ¶¶ 20-21). Specifically, according to Defendant, Warrick claims that Harry: (1) placed him on the RRL without a finding that he posed a security threat or met other criteria warranting the placement; (2) subjected him to indefinite and prolonged solitary confinement for 39 months; and (3) subjected him to limited social interaction, limited environmental stimulation, lack of mental health treatment, lack of medical treatment, limited sleep, limited exercise, and no "health aid." (*Id.* ¶ 22).

4

Defendant Harry maintains that Warrick: (1) lacks competent admissible evidence that he did not receive adequate mental health care; (2) lacks competent admissible evidence that he did not receive adequate medical care; (3) lacks competent admissible evidence that he did not receive adequate exercise; (4) lacks competent admissible evidence that he did not receive hygiene products; and (5) lacks competent admissible evidence that he received little to no sleep due to a cell light, noise, bodily fluids, or cell temperature. (*Id.* ¶ 22(a)-(e)).

Defendant Harry maintains further that Warrick: (1) cannot produce competent admissible evidence that Harry was involved in any of the conditions he alleges; (2) cannot produce competent admissible evidence to establish that the alleged conditions are extreme deprivations; (3) cannot produce competent admissible evidence to establish that the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need; (4) cannot produce competent admissible evidence to establish any actual harm to him caused by these conditions; (5) cannot produce competent admissible evidence that Harry knew of any allegedly unreasonable risk that Warrick's rights may be violated; and (6) cannot produce competent admissible evidence that Harry was deliberately indifferent to any risk. (*Id.* ¶¶ 23-28).

Defendant Harry avers that she did not place Warrick on the RRL and did not review Warrick's continued placement on the RRL. (*Id.* ¶¶ 29-30).

Warrick "disputes" these facts by citing to caselaw and legal research. (Doc. 116 ¶¶ 6-7). He contends that the fact that he "suffers from serious mental illness, intellectual disabilities, and multiple health issues...was a clear warning that Harry was deliberately indifferent to the potential for serious harm caused by subjecting him to prolonged solitary confinement." (Id. ¶ 6).

Facts Pertaining to Exhaustion

DC-ADM 804 is the Department of Corrections' policy concerning grievances and appeals. (Doc. 107 ¶ 31; Doc. 116 ¶ 8).

In 2021, while housed at SCI-Camp Hill, Warrick filed five grievances. (Doc. 107 ¶ 32). The grievances filed during the relevant time period are as follows: 915855, 917339, 920244, 920953, 989227. (Id. ¶ 33). Of these five grievances, only one—grievance number 989227—was appealed to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (Id. ¶¶ 34-35).

In response, Warrick asserts that "[n]one of those grievances involved anything to do with solitary confinement or it[]s effects." (Doc. 116 ¶ 8). Warrick does not dispute Defendant Harry's contention that he failed to exhaust his administrative remedies regarding his Eighth Amendment conditions of confinement claim. (Id.). Warrick asserts that he attempted to appeal his placement on the RRL by relying on caselaw and asserting that in the RHU/RRL, "no staff member takes kindly to an inmate filing a grievance." (Id.).

Facts Pertaining to Damages

Defendant Harry maintains that Warrick: (1) cannot produce competent admissible evidence that he incurred a physical injury due to the alleged lack of process regarding reviews of his RRL status; (2) cannot produce competent admissible evidence that he incurred a physical injury due to the alleged conditions of confinement; (3) cannot produce competent admissible evidence that he incurred a physical injury due to any actions taken by Defendant Harry; (4) cannot produce competent admissible evidence of any evil motive or intent on the part of Defendant Harry; and (5) cannot produce competent admissible evidence of any reckless or callous indifference on the part of Defendant Harry. (Doc. 107 ¶¶ 36-40).

In response, Warrick asserts that due to the mental harm he suffered from placement in solitary confinement, he attempted suicide, went on a hunger strike, staff berated him, and staff sometimes ignored him. (Doc. 116 ¶ 9).

## II.    Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non -moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record…or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

8

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III.    **Discussion**

Defendant Harry seeks summary judgment on the following grounds: (1) Warrick failed to properly exhaust his administrative remedies; (2) Warrick failed to establish a Fourteenth Amendment claim; (3) Warrick failed to establish an Eighth Amendment claim; and (4) Warrick cannot establish any basis for damages.  (Doc. 108).  The Court begins its analysis with the threshold question of whether Warrick has exhausted his administrative remedies prior to proceeding to federal court.

A.    Administrative Exhaustion[2]

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.*,

requires prisoners to exhaust available administrative remedies before suing prison officials

for alleged constitutional violations. *See id.* § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639,

642 (2016) (explaining that only "available" remedies must be exhausted). The PLRA

"exhaustion requirement applies to all inmate suits about prison life, whether they involve

general circumstances or particular episodes, and whether they allege excessive force or

some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It has been made clear

that the exhaustion requirement is mandatory. *See Williams v. Beard*, 482 F.3d 637, 639

(3d Cir. 2007); *see also Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that the

exhaustion requirement of the PLRA applies to grievance procedures "regardless of the

relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir.

2000) (same). "[I]t is beyond the power of [any] court...to excuse compliance with the

exhaustion requirement." *Nyhuis*, 204 F.3d at 73 (quoting *Beeson v. Fishkill Corr. Facility*,

28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable

grievance procedures and rules. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004). The

---

[2]    Because Defendant raised the issue of exhaustion of administrative remedies, the Court issued an Order notifying the parties that it would consider exhaustion in its role as factfinder in accordance with *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018) and *Small v. Camden Cnty.*, 728 F.3d 265 (3d Cir. 2013), and afforded the parties the opportunity to supplement the record with any additional evidence relevant to exhaustion of administrative remedies. (Doc. 122).

PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with procedural requirements. *Spruill*, 372 F.3d at 227-32; *see also Nyhuis*, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. *Spruill*, 372 F.3d at 227-32; *see also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to him. *See Rinaldi v. United States*, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)). "An administrative remedy is unavailable when it "operates as a simple dead end[,]…is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019)).

The Department of Corrections employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases. *See Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002); *Commonwealth of Pa., Dep't of Corr., Inmate Grievance Sys.*, Policy No. DC-ADM 804 ("DC-ADM 804"). If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form

11

DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based." DC-ADM 804 § 1(A)(3)-(5). An adverse decision by the Grievance Coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection. *Id.* § 2(A)(1). Finally, the decision of the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals, and again must be submitted within 15 working days of the date of the Facility Manager's decision. *Id.* § 2(B)(1).

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court." *Id.* § 1(A)(11).

Defendant asserts that Warrick filed five grievances during the relevant time period— numbers 915855, 917339, 920244, 920953, and 989227. (Doc. 107 ¶ 33; Doc. 108, at 8-9). Those grievances are as follows.

On February 19, 2021, Warrick filed grievance number 915855 regarding his refusal to go into a specific cell. (Doc. 107-12, at 3). On February 22, 2021, the Grievance Coordinator rejected the grievance because the matter should have been pursued through

DC-ADM 801, Inmate Discipline/Misconduct Procedures. (*Id.* at 2). Warrick did not appeal this grievance to the Facility Manager or SOIGA. (*See* Doc. 107-12).

On March 1, 2021, Warrick filed grievance number 917339 complaining about inadequate lunch trays. (Doc. 107-13, at 3). On March 2, 2021, the Grievance Coordinator rejected the grievance and found that Warrick did not indicate that he was personally affected by a Department policy or facility action or policy. (*Id.* at 2). Warrick did not appeal this grievance to the Facility Manager or SOIGA. (*See* Doc. 107-13).

On March 20, 2021, Warrick filed grievance number 920244, wherein he stated that he was released from the RHU without his property. (Doc. 107-14, at 3). On March 22, 2021, the Grievance Coordinator rejected the grievance because Warrick did not provide the required documentation with the grievance. (*Id.* at 2). Warrick did not appeal this grievance to the Facility Manager or SOIGA. (*See* Doc. 107-14).

On March 25, 2021, Warrick filed grievance number 920953, wherein he stated that he was missing property that was given back to him after he was released from the RHU. (Doc. 107-15, at 5). On April 22, 2021, the Grievance Coordinator denied the grievance. (*Id.* at 4). Warrick filed an appeal to the Facility Manager. (*Id.* at 3). On May 11, 2021, the Facility Manager, Defendant Harry, upheld the initial response and denied Warrick's appeal. (*Id.* at 2). Warrick did not appeal to SOIGA. (*See* Doc. 107-15).

On July 8, 2022, Warrick filed grievance number 989227, alleging that officials at SCI-Camp Hill subjected him to cruel and unusual punishment in violation of the Eighth

13

Amendment. (Doc. 107-16, at 6-9). Warrick asserted that SCI-Camp Hill denied him his property, legal material, showers, clothing, a wash rag, cosmetics, shower shoes, a phone call, and cleaning supplies and lunch upon intake. (*Id.*). He also alleged that correctional officers verbally harassed him. (*Id.*). On August 22, 2022, the Grievance Coordinator denied the grievance. (*Id.* at 4-5, 10-11). Warrick filed an appeal to the Facility Manager. (*Id.* at 3). On September 13, 2022, the Facility Manager upheld the initial response and denied Warrick's appeal. (*Id.* at 2). Warrick then filed an appeal to SOIGA, and the Chief Grievance Officer denied the appeal. (*Id.* at 16-17).

Two conclusions can be drawn from this grievance history.

First, none of these grievances (the only grievances filed during the relevant time period) concerned Warrick's present claims— a Fourteenth Amendment due process claim and an Eighth Amendment conditions of confinement claim.[3]

Second, Defendant Harry's only involvement in the grievance process was in her role as Facility Manager for the second-level review of grievance number 920953. (Doc. 107-15, at 2). Investigating and denying a grievance appeal that alleges inadequate conditions of confinement is not equivalent to being deliberately indifferent to a prisoner's

---

[3] While Warrick did allege, in grievance number 989227, that officials at SCI-Camp Hill subjected him to cruel and unusual punishment in violation of the Eighth Amendment, the allegations in that grievance differ from the claims presently before the Court. (Doc. 107-16, at 6-9). In grievance number 989227, Warrick asserted that SCI-Camp Hill denied him his property, legal material, showers, clothing, a wash rag, cosmetics, shower shoes, a phone call, and cleaning supplies and lunch upon intake, and that correctional officers verbally harassed him. (*Id.*). Here, Warrick asserts that he endured limited social interaction, limited environmental stimulation, lack of mental health treatment, lack of medical treatment, limited sleep, limited exercise, and limited "health aid." (Doc. 80 ¶¶ 11(1)-(7)).

14

complaints. *See Alexander v. Gennarini*, 144 F. App'x 924, 925 (3d Cir. 2005) (explaining that prisoner's claims against certain defendants were "properly dismissed" because the allegations against them "merely assert their involvement in the post-incident grievance process"). Warrick is not excused from administratively exhausting his claims against Defendant Harry—as required by the PLRA—simply because, in her role in the grievance process, she denied relief under DC-ADM 804. Moreover, Defendant Harry is not named in the grievances and there are no conditions of confinement or due process claims raised against her in the grievances. *See* DC-ADM 804 § 1.A.11 (providing that, in the grievance, "[t]he inmate shall identify individuals directly involved in the event(s)"). Warrick never exhausted his claims against Defendant Harry.

As Defendant has provided evidence to support her failure to exhaust defense, the burden shifts to Warrick to produce evidence that the DOC administrative remedy process was not available to him. Warrick failed to meet his burden.

Warrick does not attempt to dispute Defendant's contention that he did not exhaust his administrative remedies regarding his Eighth Amendment conditions of confinement claim. (*See* Doc. 116 ¶ 8).

With respect to the Fourteenth Amendment due process claim, Warrick argues that there were impediments to the administrative procedures—he asserts that "as is generally customary in the RHU/RRL, no staff member takes kindly to an inmate filing a grievance." (Doc. 116 ¶ 8). Warrick does not provide an affidavit, declaration, or other statement made

under penalty of perjury to support a claim that the administrative remedy process was not available to him. The Court finds that Warrick's statement alone is insufficient to survive Defendant's motion for summary judgment. "As a general proposition, 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'"[4] *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (quoting *Kirleis v. Dickie, McCarney & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)). The purpose of summary judgment proceedings "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888.

Warrick has submitted two purported grievances that he claims he attempted to file regarding his AC status. (Doc. 116-6). Warrick's claim that he attempted to file two grievances at the institution level does not satisfy the exhaustion requirement for at least two reasons. First, the grievances do not have grievance numbers and there is no indication that they were ever submitted to the institution. (*Id.*). Second, accepting the grievances at face value, it is apparent that submitting an initial grievance with the institution would not constitute complete exhaustion since, if the Grievance Coordinator denies an initial grievance and the inmate remains dissatisfied, the inmate must file an appeal to the Facility Manager, and if the Facility Manager denies the grievance and the inmate still remains dissatisfied, the inmate must then lodge a final appeal to SOIGA. Only if the grievance is denied by SOIGA has exhaustion been completed, and the inmate may then

---

4    Here, Warrick did not even file an affidavit.

16

file a civil action.  Warrick has not submitted any evidence that he complied with these mandatory steps.

The Court finds that, regardless of the legitimacy of the two grievances attached to Warrick's statement of facts in opposition to Defendant's motion for summary judgment, neither of those grievances reveal that they were ever pursued further or appealed to the Facility Manager or SOIGA.  (Doc. 116-6).  Thus, by his own exhibits, it is clear that Warrick failed to properly exhaust administrative remedies.  The failure to pursue the appropriate administrative process with respect to his claims precludes the litigation of such claims.

The record simply does not support a finding that the administrative process was unavailable to Warrick.  To the contrary, it establishes that Warrick had full and ready access to the administrative remedy process, as he filed numerous administrative remedies while in DOC custody (Doc. 107-11), which "militates against the conclusion that [he] [was] impeded from exhausting administrative remedies."  *Hubbard v. Danberg*, 408 F. App'x 553, 556 (3d Cir. 2010).  Defendant Harry is therefore entitled to summary judgment on the basis of Warrick's failure to exhaust administrative remedies.

Assuming, for the sake of argument, that prison officials thwarted Warrick's attempt to comply with the prison grievance process and that he is excused from the exhaustion requirement, the Court finds that his claims fail on the merits, as set forth below.

17

B.      Eighth Amendment Claim

Warrick avers that in violation of his Eighth Amendment rights, he was kept in solitary confinement for 39 months.  (Doc. 80 ¶¶ 22, 24).  Warrick asserts that he was subjected to limited social interaction, limited environmental stimulation, lack of mental health treatment, lack of medical treatment, limited sleep, limited exercise, and limited "health aid."  (*Id.* ¶¶ 11(1)-(7)).  He contends that there was no "[meaningful] penological justification for subjecting [him] to said conditions."  (*Id.* ¶ 22).

The Supreme Court has held that "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise."  *McKune v. Lile*, 536 U.S. 24, 39 (2002).  Thus, a transfer of a prisoner to the RHU or RRL alone does not violate the Eighth Amendment.  *See Williams v. Armstrong*, 566 F. App'x 106, 109 (3d Cir. 2014) (because the Eighth Amendment applies only when a deprivation results in the denial of "the minimal civilized measure of life's necessities," placement of prisoner in RHU for 112 days alone, without allegation that he was denied life's necessities, did not state a claim for relief); *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997); *Gibson v. Lynch*, 652 F.2d 348, 352 (3d Cir. 1981).  Nor does mere placement of an inmate in AC status or on the RRL alone violate the Eighth Amendment.  *See Bramble v. Wetzel*, 2022 WL 55021, at *7 (M.D. Pa. Jan. 5, 2022).

In order to maintain a claim under the Eighth Amendment, a prisoner must show that: (1) he was subjected to a deprivation that was "objectively, sufficiently serious; a prison

18

official's act or omission must result in the denial of the minimal civilized measure of life's necessities"; and (2) a prison official must have acted with "deliberate indifference to a prisoner's…needs," which occurs only if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). To meet the objective component, the inmate must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834 (citation omitted), or a "single, identifiable human need," *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *see Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (only "extreme deprivations" are sufficient to make out an Eighth Amendment claim). These needs include "food, clothing, shelter, sanitation, medical care and personal safety." *Griffin*, 112 F.3d at 709. To satisfy the subjective prong of the Eighth Amendment test, an inmate must show that the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 229 (3d Cir. 2015) (quoting *Farmer*, 511 U.S. at 847). The inmate "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well documented, or expressly noted by prison officials in the past such that defendants must have known about the risk." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010) (quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted). In evaluating this prong, the court "may also consider whether officials 'had a legitimate penological purpose' behind their conduct."

*Porter v. Pa. Dep't of Corr.*, 974 F.3d 431,446 (3d Cir. 2020) (citation omitted) ("The Eighth Amendment prohibits punishments without penological justification.").

An inmate is not entitled to relief simply because of exposure to uncomfortable or inconvenient conditions of confinement. *Rhodes v. Chapman*, 452 U.S. 337,347 (1981). "Where conditions are not 'cruel and unusual' but merely 'restrictive and even harsh,' they do not violate the Eighth Amendment but rather 'are part of the penalty that criminal offenders pay for their offenses against society.'" *Washington v. Wetzel*, 2022 WL 1782509, at *7 (W.D. Pa. June 1, 2022) (quoting *Rhodes*, 452 U.S. at 347). Thus, "so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Thomas v. Tice*, 948 F.3d 133, 139 (3d Cir. 2020); *see Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990) ("the prison environment itself may not be so brutal or unhealthy as to be in itself a punishment"). Where, as here, an inmate's allegations concern a segregated housing unit, "[t]he touchstone is the health of the inmate," and the court must consider both "[t]he duration and conditions of segregated confinement" to determine the constitutionality of that confinement. *Young v. Quinlan*, 960 F.2d 351,364 (3d Cir. 1992), *superseded by statute on other grounds as stated in Nyhuis*, 204 F.3d at 71 n.7.

Defendant contends that Warrick cannot satisfy either the objective or subjective component of a conditions of confinement claim. (Doc. 108, at 14-23). Defendant argues that, with respect to the objective factor, despite his allegations, he has not produced any

20

evidence that by his placement in the RHU or on the RRL, he was denied the minimal civilized measure of life's necessities.  (*Id.* at 16); *see Bramble*, 2022 WL 55021, at *8 ("while we recognize that Bramble remained in Administrative Custody on the RRL for over two years before he was returned to the Delaware DOC, Bramble has not set forth any evidence tending to show that his confinement in Administrative Custody denied him 'the minimal civilized measure of life's necessities,' or that there was no legitimate penological objective for his placement in Administrative Custody.").  Defendant also argues that there is no evidence that prison conditions posed an unreasonable risk of serious damage to his current or future physical or mental health.  (Doc. 108, at 16-17).  Finally, Defendant argues that there is simply no evidence establishing that she was personally involved, as she had no part in Warrick's placement on the RRL or continued placement on the RRL.  (*Id.*).

As stated, Warrick asserts that he was held in solitary confinement for 39 months and subjected to limited social interaction, limited environmental stimulation, lack of mental health treatment, lack of medical treatment, limited sleep, limited exercise, and limited "health aid."  (Doc. 80 ¶¶ 11(1)-(7), 22, 24).

Viewing the record and all reasonable inferences to be drawn therefrom in Warrick's favor, he fails to establish a genuine dispute as to whether his conditions of confinement caused an objectively, sufficiently serious deprivation.  *See Coit v. Garman*, 812 F. App'x 83, 87-88 (3d Cir. 2020) (vague and conclusory allegations are insufficient to create issues of material fact to preclude summary judgment); *Johnson v. Wetzel*, 209 F. Supp. 3d 766,

21

777 (M.D. Pa. 2016) ("Courts must be cognizant of the 'fundamental difference' between deprivation of discretionary privileges that a prisoner in general population may enjoy and deprivation 'of the basic necessities of human existence.'" (citation omitted)); *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) ("the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" (quoting *Farmer*, 511 U.S. at 834)).

First, Warrick's placement in the RHU and on the RRL does not in and of itself constitute an unconstitutional condition of confinement. *See Young*, 960 F.2d at 364 ("Segregated detention is not cruel and unusual punishment *per se*, as long as the conditions of confinement are not foul, inhuman or totally without penological justification."); *Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual."); *Johnson*, 209 F. Supp. 3d at 777 ("a prisoner's placement in solitary confinement does not, in itself, violate the Constitution").

Second, Warrick has not set forth any evidence from which a reasonable jury could conclude that his confinement in the RHU denied him the minimal civilized measure of life's necessities. There is no evidence that Warrick was denied "adequate food, clothing, shelter, and medical care," or that he was housed in unsafe conditions. *Farmer*, 511 U.S. at 832. Indeed, Warrick does not contend that he was unable to shower, did not receive adequate clothing, or that the cell in which he was housed had persistent unsanitary or

unsafe conditions.  Moreover, Warrick acknowledges, and the record reflects, that he was

seen periodically by the PRC, which provided a forum to address issues he experienced in

the RHU.  (Doc. 107-6; Doc. 107 ¶ 15; Doc. 116 ¶ 4).  The records show that Warrick

"accept[ed] meals, exercise, showers, and medication" and that he was "quiet and active."

(Doc. 107-6, at 19, 21, 23).  The records also show that the PRC granted Warrick additional

privileges during his time in the RHU, such as a television, radio, unrestrained activities, and

other privileges.  (Doc. 107-6, at 19, 30).

Warrick complains that he was deprived of sleep due to the constant light in his cell.

(Doc. 80 ¶ 11(5)).  While "bright, constant illumination that causes 'grave sleeping problems

and other mental and psychological problems' can establish an Eighth Amendment

deprivation," *Mammana*, 934 F.3d at 374 (citation omitted), Warrick fails to demonstrate that

the lighting in his cell "caused any physical or mental problems to the extent that they

required medical attention," and "nothing in the record suggests that Defendant[] 'knew the

security light might pose a substantial risk of serious harm to' Plaintiff," *Easley v. Tritt*, 2021

WL 978815, at *9 (M.D. Pa. Mar. 16, 2021) (citations omitted).

Warrick also complains that he had limited social interaction and non-contact

visitation while in the RHU.  (Doc. 80 ¶ 11(1)).  No reasonable juror could find such

deprivation of social interaction and visitation privileges amounts to an Eighth Amendment

violation.  *See Overton v. Bazzetta*, 539 U.S. 126, 137 (2003) ("withdrawal of visitation

privileges for a limited period as a regular means of effecting prison discipline" does not

violate the Eighth Amendment); *Henry v. Dep't of Corr.*, 131 F. App'x 847, 850 (3d Cir. 2005) (restriction to non-contact visitation does not "violate civilized standards of humanity and decency" (citation omitted)); *Fantone v. Herbik*, 528 F. App'x 123, 128 n.5 (3d Cir. 2013) ("denial of telephone and television privileges does not amount to cruel and unusual punishment").

Warrick further complains that he had limited exercise time and inadequate exercise equipment, and improper or inadequate access to hygiene products while in the RHU. (Doc. 80 ¶¶ 11(6), (7)). He does not contend that he had a complete denial of his right to exercise or receive hygiene products. (*Id.*). Instead, Warrick contends that the recreation areas did not have "necessary equipment to work out such as: Pull Up Bars, Dip Bars, Tread Mills, Weight Machines, Exercise Bikes, etc." (*Id.* ¶ 11(6)). He further contends that he was unable "to order proper and adequate hygiene products." (*Id.* ¶ 11(7)). A reasonable juror could not find that limited exercise equipment/exercise time and limited hygiene products amount to an Eighth Amendment violation. *See, e.g., Fortune*, 379 F. App'x at 122 (stating that a 15-day limitation of exercise did not violate the constitution); *Watson v. Sec'y Pennsylvania Dep't of Corr.*, 567 F. App'x 75, 79 (3d Cir. 2014) (*per curiam*) (affirming district court's dismissal of Eighth Amendment claim alleging that plaintiff had to brush teeth with worn down toothbrush and periodically obtained toothpaste from other inmates but occasionally went days without it); *Barndt v. Wenerowicz*, 2016 WL 6612441, at *4 (E.D. Pa. Nov. 8, 2016) (concluding that a 28-day deprivation did not violate

24

the constitution where plaintiff suffered no ill effects and had room to exercise in his cell),

*aff'd*, 698 F. App'x 673 (3d Cir. 2017).

Third, Warrick's assertion that confinement in the RHU caused him physical and

mental harm is insufficient to show he was "incarcerated under conditions posing a

substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *see, e.g., Graziano v. Pa. Dep't*

*of Corr.*, 2023 WL 6389756, at *20 (W.D. Pa. Sept. 30, 2023) (allegation that inmate's

mental health status put him at heightened risk of harm when held in RHU insufficient to

show that such placement "violate[d] civilized standards of humanity and decency"

(alteration in original) (quoting *Griffin*, 112 F.3d at 709). The summary judgment record

shows that Warrick was treated for his ailments and was over 93.8%-99% compliant with his

medication regimen and regularly accepted his medication. (Doc. 107-6, at 19, 21).

Finally, while no bright line rule exists to say when the duration of solitary

confinement contravenes the Eighth Amendment, Warrick's assertions are distinguishable

from the prolonged periods of solitary confinement that courts have found to satisfy the

objective component of an Eighth Amendment claim. *See, e.g., Porter*, 974 F.3d at 443 ("a

reasonable jury could conclude that 33 years in solitary confinement posed a substantial

risk of harm"); *Noble v. Wetzel*, 2021 WL 6071490, at *3 (W.D. Pa. Dec. 23, 2021) (nearly

20 years of solitary confinement satisfied the objective Eighth Amendment standard).

Warrick thus provides no evidence to show that the conditions he experienced in the

RHU created a substantial risk of serious harm or deprived him of the minimal civilized

25

measure of life's necessities.  Because Warrick's assertions are insufficient to create a genuine issue of material fact as to whether his conditions of confinement violated the Eighth Amendment, summary judgment in favor of Defendant Harry is warranted.

As to the subjective component of Warrick's Eighth Amendment claim, there is no question that prolonged solitary confinement may pose risks to an inmate's mental health. *See Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d Cir. 2017); *Johnston v. Wetzel*, 431 F. Supp. 3d 666, 677-78 (W.D. Pa. 2019).  Here, however, nothing in the record indicates that Defendant Harry knew facts from which she could have inferred that Warrick should not be in the RHU.  *See Nifas v. Beard*, 374 F. App'x 241, 245 (3d Cir. 2010) (where nothing in treatment plan indicated inmate's mental health would be seriously affected by AC confinement, "no reasonable juror could conclude from the record evidence that AC placement posed a substantial risk of serious harm to [the inmate] or that the defendants were deliberately indifferent to his psychological condition"); *see also Farmer*, 511 U.S. at 845 ("prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause").  There is no evidence of record that Defendant Harry knew of and ignored a substantial risk of serious harm.  *See Nifas*, 374 F. App'x at 245; *Spruill*, 372 F.3d at 236 ("absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official…will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference").

To the extent such risk existed, it was clearly outweighed by the DOC's legitimate penological interest in responding to the imminent safety concerns presented by Warrick's lengthy history of assaults and disorderly behavior.  He had numerous misconducts since he entered DOC custody, including a staff assault, multiple threats to staff, fighting, assault, abusive language, refusing orders, unauthorized use of the mail/phone, possession of contraband including homemade weapons, and a separation.  (Docs. 107-2, 107-6, 107-7, 107-8).  Warrick was designated as H-Code due to his "[e]xtensive history of assaultive behavior and weapons possession."  (Doc. 107-2, at 4).  Thus, the uncontroverted record shows that Warrick was not transferred to the RRL randomly, but as a result of multiple misconducts for engaging in or encouraging unauthorized activities.  This plainly suffices to show a legitimate penological purpose for Warrick's continuation on the RRL and in the RHU.  *See Rosario v. Wetzel*, 2025 WL 755516, at *5 (W.D. Pa. March 10, 2025) (PRC reviews documented the plaintiff's "long assaultive history towards staff and inmates" as a reason for placement on RRL and transfer to the Intensive Management Unit), *aff'd*, 2025 WL 2452464, at *2-3 (finding "restrictions placed upon [inmate] were amply justified" by his record of violent behavior, and "[p]rison officials thus had good reason to place him in segregated detention and to keep him there until he was able to control his antisocial behavior").

In sum, none of the conditions imposed on Warrick—alone or in combination— violated his constitutional right to be free of cruel and unusual punishment.  The record fails

27

to support that the conditions he experienced in the RHU denied him the minimal civilized measure of life's basic necessities or subjected him to a substantial risk of serious harm. Moreover, he failed to set forth evidence that Defendant Harry acted with deliberate indifference to Warrick's health or safety as related to any allegedly unconstitutional condition or combination of conditions. Rather, the record reflects that there was a legitimate penological purpose for his placement in the RHU and on the RRL, and his continuation on that status. Accordingly, Defendant Harry is entitled to summary judgment on the Eighth Amendment Claim.

### C.     Fourteenth Amendment Claim

#### 1.     Personal Involvement

Defendant first argues that she was not personally involved in Warrick's continued placement on the RRL.  (Doc. 108, at 10-11; Doc. 120, at 6).

To impose liability upon a defendant in a section 1983 action, the plaintiff must show that the defendant had personal involvement in the wrongdoing.  *Williams v. City of York*, 967 F.3d 252, 261 (3d Cir. 2020). *Respondeat superior* alone does not give rise to section 1983 liability.  *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  An allegation that the defendant was responsible for supervising those involved, without more, is insufficient.  *Rode*, 845 F.2d at 1208.  Rather, liability must be demonstrated by showing that the defendant personally directed or, with actual knowledge, acquiesced in the conduct.  *Dooley*, 957 F.3d at 374

28

(citing *Rode*, 845 F.2d at 1207).  The plaintiff's allegations must describe the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct. *Chavarriaga*, 806 F.3d at 222 (citing *Rode*, 845 F.2d at 1207).  Constructive knowledge is not enough; the defendant must have had actual knowledge of the conduct.  *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995)).

Defendant Harry was the Superintendent of SCI-Camp Hill during the relevant time period.  (Doc. 107 ¶ 9).  Defendant has submitted evidence that Warrick's placement on the RRL was initiated in 2021 while he was housed at SCI-Mahanoy, and that the Superintendent of SCI-Mahanoy approved his placement.  (Doc. 107-2; Doc. 107 ¶ 11).  Defendant has also submitted evidence that Warrick's status was reviewed in 2022 when he was housed at SCI-Phoenix, and thus the Superintendent of SCI-Phoenix approved his continued RRL status.  (Doc. 107-8).

In 2023, Defendant Harry became Secretary of the DOC.  (Doc. 107 ¶ 9).  Pursuant to DC-ADM 802, it was the duty of the Executive Deputy Secretary for Institutional Operations ("EDSI") to review RRL placement and continuation, not the Secretary.  (Doc. 107-4, DC-ADM 802 § 1(C)(1) ("The Executive Deputy Secretary for Institutional Operations (EDSI) must approve placing the inmate in [RRL] status"); § 4(B)(1) ("An inmate identified on the RRL may not be released from a Security Level 5 (SL5) Housing Unit without the written approval of the Executive Deputy Secretary for Institutional Operations (EDSI)"); Doc. 107-5, DC-ADM 802 §§ 1(C)(1), 4(B)(1) (same)).

Defendant has submitted evidence in the form of Vote Sheets reflecting that when Warrick's status was reviewed in 2023, the final decision was made by the EDSI, in accordance with DC-ADM 802. (Doc. 107-9). Finally, Defendant has submitted evidence that when Warrick's status was reviewed in 2024 and he was removed from the RRL, the final decision was made by the EDSI, in accordance with DC-ADM 802. (Doc. 107-7). The only evidence of Defendant Harry's participation in Warrick's RRL status is the April 2021 "Prohibited Violent Act Post-Response Review" form that appears to bear Harry's signature, indicating that she approved the request that Warrick should be considered for placement on the RRL after he assaulted Correctional Officer Donna Green. (Doc. 116 ¶ 3; Doc. 116-1). While the record indicates that Defendant Harry approved the initial recommendation to place Warrick on the RRL, Warrick offers no other evidence of her personal involvement. He does not provide any evidence that Defendant Harry had any personal involvement in the PRC reviews or that she personally caused the PRC reviews to be perfunctory. Additionally, Warrick fails to show how Defendant Harry personally denied him constitutionally adequate review of his placement. In fact, Warrick admits that Defendant Harry was not involved in his AC status reviews. (Doc. 107 ¶ 16; Doc. 116 ¶ 5). As such, Warrick has not presented a genuine material fact question as to Defendant Harry's personal involvement. The Court will nevertheless proceed to address the merits of Warrick's due process claim.

## 2.    Due Process Claim

The due process analysis starts with determining whether the liberty interest

asserted is protected by the Fourteenth Amendment. *Montanez v. Sec'y Dep't of Corr.*, 773

F.3d 472, 482-83 (3d Cir. 2014) (quoting *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650,

663 (3d Cir. 2011)); *see also Holland v. Rosen*, 895 F.3d 272, 297 (3d Cir. 2018) (citations

omitted).  If it is a protected interest, the Court must then determine what process is

necessary to protect it. *Newman v. Beard*, 617 F.3d 775, 783 (3d Cir. 2010) (citation

omitted).  If the interest is not protected, no process is necessary.  Hence, as a threshold

matter, the plaintiff must establish that he had a protected liberty interest.  *See Fraise v.*

*Terhune*, 283 F.3d 506, 522 (3d Cir. 2002) (finding that succeeding on a due process claim

requires demonstrating that the plaintiff was deprived of a liberty interest).

Prisoners do not enjoy the same liberty interests as others do.  *See Sandin v.*

*Conner*, 515 U.S. 472, 485 (1995).  Incarceration "brings about the necessary withdrawal or

limitation of many privileges and rights, a retraction justified by the considerations

underlying our penal system." *Id.* (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433

U.S. 119, 125 (1977)).  "To rise to the level of a liberty interest, the right alleged must confer

'freedom from restraint which…imposes *atypical and significant hardship* on the inmate in

relation to the ordinary incidents of prison life.'" *Williams v. Sec'y Pa. Dep't of Corr.*, 848

F.3d 549, 559 (3d Cir. 2017) (emphasis in *Williams*) (quoting *Griffin*, 112 F.3d at 708).  "As

long as the conditions or degree of confinement to which the prisoner is subjected is within

31

the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montayne v. Haymes*, 427 U.S. 236, 242 (1976).

The question is whether Warrick has established that his approximate three and a half years in the RHU and on the RRL imposed an atypical and significant hardship. In making this determination, the Court considers: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Williams*, 848 F.3d at 560 (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2017)). Prolonged, indefinite solitary confinement may impose an atypical and significant hardship. *Shoats*, 213 F.3d at 144.

The Court first considers the duration of Warrick's placement on the RRL and segregation in RHU. There is no bright line defining where the duration of segregation becomes atypical. *Williams*, 848 F.3d at 561-62. In *Shoats*, the Third Circuit found that eight years in administrative confinement was "not only atypical, but is indeed 'unique,'" 213 F.3d at 144, while the Third Circuit in *Smith v. Mensinger* found that seven months in disciplinary confinement was not, 293 F.3d 641, 654 (3d Cir. 2002), and the Third Circuit in *Griffin* found that 15 months in administrative custody was not, 112 F.3d at 708 (holding that "exposure to the conditions of administrative custody for periods as long as 15 months 'falls within the expected parameters of the sentence imposed…by a court of law'").

32

It is possible that Warrick's approximate three and a half years in specialized units may be considered atypical. (Doc. 107-2). He was placed in the RHU on April 20, 2021 and was released to general population on November 14, 2024. (*Id.*). Warrick was approved for RRL removal on October 28, 2024. (Doc. 107 ¶ 19).

To determine whether an inmate's conditions constitute a "dramatic departure" from the accepted standards for confinement, *Sandin*, 515 U.S. at 485, courts in the Third Circuit look to factors including: the amount of time the inmate is confined to his cell each day, whether the inmate eats meals by himself, his contact with family and individuals other than DOC officials, access to natural light and outdoor activities, and the opportunity to participate in educational, vocational, religious, and organizational activities. *Shoats*, 213 F.3d at 144 (finding significant hardship where inmate was confined in "virtual isolation" for eight years with no prospect of release, was confined to cell 23-24 hours a day, ate meals alone, had no contact with family, was prohibited from participating in prison activities, and his sole contact was with DOC officials). As set forth above, this Court has determined that Warrick's conditions of confinement did not rise to the level of cruel and unusual, and the Court likewise finds that neither did those conditions impose an atypical and significant hardship. Importantly, Warrick's conditions were not of indefinite duration. Further, the PRC granted Warrick additional privileges during his time in the RHU, such as a television, radio, unrestrained activities, and other privileges. (Doc. 107-6, at 19, 30). The Court

33

therefore finds that Warrick failed to show an atypical and significant hardship necessary to implicate a protected liberty interest.

Even assuming that Warrick did suffer a deprivation of a protected liberty interest, he fails to show a genuine factual dispute as to whether Defendant denied him meaningful review of his RRL status and RHU placement. When an inmate's continued placement on the RRL in segregated confinement implicates a protected liberty interest, due process requirements are met by "the periodic review offered to Pennsylvania inmates who are indefinitely confined in administrative confinement." *Bracey v. Pa. Dep't of Corr.*, 686 F. App'x 130, 135 (3d Cir. 2017). "The reviews must be meaningful in the sense that the review is not conducted in 'rote fashion,' becoming an ostensible mechanism for indefinite restrictive confinement. They must also be periodic in the sense that they are conducted with such frequency that the reasons justifying the confinement are 'current.'" *Watson v. Wetzel*, 2024 WL 5096209, at *10 (E.D. Pa. Dec. 12, 2024) (citations omitted).

The undisputed evidence demonstrates that Warrick was seen by the PRC at periodic hearings on the following dates—July 29, 2021; August 5, 2021; August 12, 2021; August 19, 2021; August 26, 2021; September 2, 2021; September 9, 2021; September 16, 2021; September 24, 2021; October 21, 2021; November 18, 2021; December 16, 2021; December 29, 2021; January 5, 2022; January 12, 2022; January 19, 2022; January 26, 2022; February 2, 2022; February 9, 2022; March 24, 2022; May 25, 2022; June 15, 2022; July 6, 2022; September 7, 2022; September 21, 2022; November 30, 2022; February 22,

34

2023; May 17, 2023; June 28, 2023; August 16, 2023; November 15, 2023; February 14, 2024; and November 14, 2024.  (Doc. 107 ¶ 15; Doc. 107-6).

Warrick admits that he received the periodic reviews to which he was due, but he contends that at the majority of the reviews, he "was either not allowed to speak, or his concerns were total disregarded."  (Doc. 116 ¶ 4).  Warrick failed to present any competent evidence that his PRC reviews were constitutionally inadequate.  And he does not argue that that purported deficiencies of the hearings denied him notice of the reasons for his continued placement or the opportunity to appeal the PRC's decisions.  *See Wayne v. Wetzel*, 2024 WL 3696467, at *9 (E.D. Pa. Aug. 7, 2024) (though inmate claimed he was denied notice of reasons for AC placement because reason was not listed on review form, inmate "obviously knew that the reason for his placement was his history of violent assaults").

Additionally, Defendant has produced record evidence that Warrick was informed of the reason for his continued placement on the RRL (Doc. 107-6) and Warrick cites no factual support for contending otherwise.  Indeed, Warrick was aware that he was cited for various misconducts and violations of facility rules before his confinement in the RHU and on the RRL—including a staff assault, multiple threats to staff, fighting, assault, abusive language, refusing orders, unauthorized use of the mail/phone, and possession of contraband including homemade weapons.  (Docs. 107-2, 107-6, 107-7, 107-8).  Defendant has provided ample evidence to demonstrate Warrick's history of assaultive conduct, and

35

that conduct is what led to his placement on the RRL and confinement in the RHU. Finally, as stated, Warrick admits that Defendant Harry was not involved in his AC status reviews. (Doc. 107 ¶ 16; Doc. 116 ¶ 5).

Accordingly, based on the undisputed facts and the record provided, the Court finds there is no evidence of record from which a reasonable juror could find that Defendant Harry denied Warrick the process he was due. *See, e.g., Harris v. Little*, 2025 WL 720089, at *8 (E.D. Pa. March 6, 2025) (finding inmates offered no evidence from which a reasonable juror could infer reviews were perfunctory, and further finding that progress through the Intensive Management Unit and release from RRL "belies any inference to that effect"); *Williams v. Stickney*, 2025 WL 2200911, at *10-11 (E.D. Pa. July 31, 2025) (even if annual review of RRL status was not meaningful, no defendant could be found liable in light of inmate's failure to present evidence that any defendant personally caused review to be perfunctory); *Huertas v. Sec'y Pa. Dep't of Corr.*, 533 F. App'x 64, 67 (3d Cir. 2013) (inmate "may disagree with prison officials' evaluation that ongoing administrative custody is justified by continuing security concerns, but he must show that the periodic reviews he receives are constitutionally inadequate, and he has not done so"). Warrick has failed to establish a due process violation and judgment will be entered in favor of Defendant Harry on the Fourteenth Amendment claim.[5]

---

[5] In light of the foregoing analysis, the Court need not reach Defendant's additional argument as to damages.

## IV.    Conclusion

Consistent with the foregoing, the Court will grant Defendant's Rule 56 motion and enter judgment in her favor.  (Doc. 106).  A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: July 23, 2026